## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF RHODE ISLAND

---

In re:  Andrew P. Bouchard                        BK No: 15-10543
Debtor                                            Chapter 13

---

## DECISION AND ORDER ON CREDITOR'S
## MOTION TO CONVERT OR DISMISS CASE

*In bankruptcy administration, the system will collapse if debtors
are not forthcoming.*[1]

Before this Court is the motion of creditor Amanda Rotella, former spouse of debtor

Andrew Bouchard, to convert or dismiss this chapter 13 case for bad faith. One need only review

the record here to understand the tortured path of this case and to fully appreciate Mr.

Bouchard's abuse of the bankruptcy process and his repeated efforts to manipulate his income

and expenses to fit his needs. It is the Court's foremost responsibility to protect the integrity of

the bankruptcy process for the benefit of honest debtors and their creditors. This decision

constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of

Bankruptcy Procedure 7052,[2] to the extent made applicable by Rule 9014(c). Considering the

totality of the circumstances presented, the Court finds that Mr. Bouchard lacked good faith in

the filing of his bankruptcy petition, and that it is in the best interest of the Debtor's creditors that

this case be dismissed.

## I.      Jurisdiction

The Court has jurisdiction over this matter under to 28 U.S.C. §§ 157(a) and 1334, and

Rule 109(a) of the local rules of the District Court for the District of Rhode Island  This is a core

proceeding under 28 U.S.C. § 157(b)(2)(A), (L), and (O).

---

[1] *Hannon v. ABCD Holdings, LLC (In re Hannon)*, 839 F.3d 63, 71 (1st Cir. 2016) (quoting *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 112 (1st Cir. 1987)).

[2] References to the "Bankruptcy Rules" or "Rules" shall mean the Federal Rules of Bankruptcy Procedure.

## II.    Convoluted Procedural History

On March 26, 2015, Mr. Bouchard filed a voluntary chapter 13 bankruptcy petition (Doc. #1), together with applicable schedules (Doc. #1), a Form 22C chapter 13 statement of current monthly income and calculation of commitment period (the so-called "means test" form) (Doc. #3), and a chapter 13 plan ("Plan," Doc. #4). The Plan proposed monthly payments to the Chapter 13 Trustee in the amount of $233 for 60 months; to pay directly secured creditors Attitash Mountain Village (monthly timeshare fee of $115) and Santander Consumer USA (monthly vehicle installment payment of $384); and after deduction of administrative expenses, to pay $10,582 to unsecured creditors, approximately 7% of their claims. In early May 2015, only a few days after the meeting of creditors was held as mandated by 11 U.S.C. § 341[3] ("Creditors' Meeting"), Ms. Rotella filed an initial objection to Plan confirmation (Doc. #15), which she amended soon after (Doc. #18). The Chapter 13 Trustee also objected to the Plan (Doc. #19).

On July 2, 2015, Mr. Bouchard filed an amended Schedule B (list of personal property) (Doc. #27) to add a joint bank account containing $650 he held (and still holds) with his then-girlfriend, now fiancée, Jessica Doyle, as well as clothing and a watch both valued at $200. The Court held a preliminary hearing on Plan confirmation on July 8, 2015, and then scheduled a full evidentiary hearing for September 10, 2015. Mr. Bouchard and Ms. Rotella filed a joint pretrial statement on August 24, 2015 (Doc. #39), and supporting memoranda of law (Doc. ## 42, 46). Prior to the evidentiary hearing, Ms. Rotella also filed a motion seeking to convert the case from chapter 13 to chapter 7 or, in the alternative, to dismiss the case ("Motion," Doc. #47), to which

---

[3] Unless otherwise indicated, the terms "Bankruptcy Code," "Code," "chapter," "section" and "§" refer to Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 37.

Mr. Bouchard filed an objection (Doc. # 54).[4] In light of the Motion, the evidentiary hearing was rescheduled to October 22, 2015, for Plan confirmation and consideration of the Motion. As directed by the Court, the parties filed amended joint pretrial statements on October 7, 2015 (Doc. #59), and again on October 20, 2015 (Doc. #66).

At the commencement of the October 22 evidentiary hearing, Mr. Bouchard's counsel represented that his client intended to file an amended plan, amended schedules, and an amended means test form. Consequently, the evidentiary hearing was once again rescheduled, this time to November 19, 2015. Mr. Bouchard filed amended Schedules I and J (statement of income and expenses) (Doc. #72), an amended means test (Doc. #73), and an amended plan (Doc. #74) on October 26, 2015. Line 4 of the amended means test reflected $150 in additional monthly income of Mr. Bouchard for pre-petition monthly contributions from Ms. Doyle, allegedly for utility expenses. In actuality, as the later testimony indicated, this monthly contribution was in fact $300, but because Mr. Bouchard claimed to have received it for only three of the six months prior to the petition date, he only listed it as a $150 monthly contribution.

The following day, both the Chapter 13 Trustee (Doc. #76) and Ms. Rotella (Doc. #77) filed objections to confirmation of the amended plan, and Ms. Rotella also objected to Mr. Bouchard's amended means test form (Doc. #78) and the amended Schedules I and J (Doc. #79). Adding to the confusion, the next day Mr. Bouchard filed a new set of Schedules I and J (Doc. #80), this time supplemental schedules to reflect changes to his income that would become effective in January 2016, and yet another amended plan ("First Amended Plan," Doc. #81) upon the Clerk's office termination of the amended plan filed the previous day as filed incorrectly.

---

[4] Mr. Bouchard first filed an untimely objection to the Motion (Doc. #52) that was stricken, but with leave of Court he was permitted to refile the objection as Doc. # 54.

In his revised supplemental Schedule I (Doc. #80), Mr. Bouchard disclosed that his residential lease would expire at the end of 2015, that Ms. Doyle had purchased her own home, and that he would be entering into a one-year lease with her and moving to her home the first of the year. Consequently, he would no longer receive her $300 per month contribution. In turn, his revised supplemental Schedule J indicated that his monthly rental contribution for his current apartment was reduced from $1,300 to $650 (presumably reflecting Ms. Doyle's new rent contribution in the same amount for one-half of the total rent). It also noted that once he moved into her house in January 2016, his rent payments would increase to $950 per month (this sum being one-half of Ms. Doyle's mortgage payment). This schedule also reflected the elimination of the $115 monthly timeshare payment. The First Amended Plan proposed monthly payments of $233 for seven months, $1,046 for two months, and $446 for 51 months to correspond with the changes noted in the newly revised supplemental Schedules I and J. The payment increase was intended to cure the plan payment shortfall that the Chapter 13 Trustee and Ms. Rotella asserted arose due to Mr. Bouchard's unreasonable payment of the entire rent for the apartment he shared with Ms. Doyle, rather than one-half of the total monthly rent. The Chapter 13 Trustee and Ms. Rotella objected to the First Amended Plan (Doc. ## 84, 77).[5]

On November 18, 2015, the parties filed a revised joint pretrial statement (Doc. #91), and the following day, the Court held an evidentiary hearing on confirmation of the First Amended Plan, the Motion, and the various objections. Mr. Bouchard and Ms. Rotella introduced testimony and documentary evidence, and the Court continued the hearing to November 23, 2015, for closing arguments. *See* transcript of November 19, 2015 hearing at Doc. #129 ("Tr. #129"). As has been the most unusual and candidly frustrating pattern in this case, instead of

---

[5] Ms. Rotella's objection (Doc. #77) to the earlier filed and stricken amended plan (Doc. #74) was treated as an objection to the First Amended Plan (Doc. #81).

presenting closing arguments, Mr. Bouchard's counsel informed the Court that his client once again intended to amend his proposed chapter 13 plan. After a general discussion of the anticipated amendments and potential issues of law they might raise, the Court set deadlines for the filing of this proposed amended plan and for post-trial memoranda of law.

On November 30, 2015, Mr. Bouchard filed another set of supplemental Schedules I (Doc. #98) and J (Doc. #99) and his now third proposed plan ("Second Amended Plan," Doc. #100). These revised supplemental schedules eliminated Ms. Doyle's $300 monthly contribution, increased Mr. Bouchard's rent expense to $950, and modified some utility and food expenses. The Second Amended Plan proposed monthly payments of $233 for seven months, $1,046 for two months, and $546 for 51 months, thus providing a dividend for general unsecured creditors of approximately 31% of their claims over the term of the plan, a greater percentage than previously proposed in his earlier plans. Mr. Bouchard also filed a post-hearing memorandum of law (Doc. #104), as did Ms. Rotella (Doc. #110). Once again the Chapter 13 Trustee (Doc. #112) and Ms. Rotella (Doc. #121) filed objections to confirmation of the Second Amended Plan. After a conference with the parties, the Court found it necessary to reopen the evidentiary hearing.

The reopened evidentiary hearing was held on April 28, 2016. *See* transcript at Doc. #128 ("Tr. #128"). Mr. Bouchard and Ms. Rotella submitted additional evidence, counsel presented closing arguments, and the Court directed the parties to submit post-hearing proposed findings of fact and conclusions of law.[6] After some delay, Mr. Bouchard filed his memorandum on August 16, 2016 (Doc. #133), and Ms. Rotella filed hers on September 22, 2016 (Doc. #138). The Court took the Motion and confirmation of the Second Amended Plan under advisement on October 11, 2016.

---

[6] At the April 28, 2016 hearing, the Chapter 13 Trustee stated on the record that his concerns had been satisfied and he no longer objected to the Second Amended Plan. Tr. #128 at 7.

### III.   Findings of Fact

The following findings of fact are based on the parties' stipulated facts in their joint pretrial statements and the evidence adduced at the hearings. Mr. Bouchard and Ms. Rotella married in 2004 and divorced in 2009. At the time of their divorce, the couple owned a residential condominium that was subject to a mortgage on which they were jointly liable to Pawtucket Credit Union ("PCU"). As provided in their divorce judgment, Mr. Bouchard agreed to indemnify and hold harmless Ms. Rotella from any liability resulting from that joint mortgage. Despite good intentions, sometime after the divorce Mr. Bouchard became unemployed and unable to make the mortgage payments. PCU foreclosed on the condominium and subsequently filed a state court lawsuit against both Mr. Bouchard and Ms. Rotella seeking a deficiency judgment of approximately $70,000. That action remains pending and no judgment has been entered against either Mr. Bouchard or Ms. Rotella.

Mr. Bouchard's proposed chapter 13 plans have treated his contingent debt to Ms. Rotella as a general unsecured claim. The parties agree that this debt is not a domestic support obligation as defined by the Code and would be dischargeable under a confirmed chapter 13 plan, but not dischargeable in a chapter 7 case because it is in the nature of an equitable distribution. *See* Code §§ 101(14A), 523(a)(5), 523(a)(15), 727(a)-(b), 1328(a)-(b).

On December 2, 2014, Mr. Bouchard and Ms. Doyle became co-obligors on a one-year lease for the apartment they resided in when this case was filed. The lease required monthly rent payments of $1,300, excluding utilities. Both testified that they had agreed Mr. Bouchard would pay the entire monthly rent, while Ms. Doyle would contribute $300 per month toward utility costs, even though Ms. Doyle, a financial analyst at Met Life Insurance Company, earned approximately $65,000 a year compared to Mr. Bouchard's annual income of approximately

$35,000. Initially, Mr. Bouchard could offer no plausible explanation for this lopsided arrangement other than it being what they had agreed upon. When pressed, however, he disclosed that he had agreed to pay the full rent because "[a]t the time, she [Ms. Doyle] was trying to save up for a house," and he conceded that this would help her to "save money to buy a house." Tr. #129 at 76. Ms. Doyle, however, offered another reason: "I mean, it's just something we agreed upon. I think a lot of men, it's common for them to pay mortgage or rent, so you know, we just decided that he would pay the rent and I would contribute to utilities." Tr. #129 at 139. The Court finds Mr. Bouchard's explanation more credible and truthful, particularly in light of the subsequent events discussed below.

Mr. Bouchard and Ms. Doyle resided together in the apartment from December 2014 through December 2015. Mr. Bouchard filed his chapter 13 bankruptcy petition on March 26, 2015. Unbeknown to the Court, Ms. Rotella, her counsel, the Trustee, and apparently Mr. Bouchard's own counsel, Ms. Doyle executed a purchase and sales agreement on a home on August 22, 2015 and consummated the sale on October 6, 2015, taking title solely in her name. This is the residence the couple moved to in January 2016. About two weeks after the sale closing, on October 22, 2015, the Court convened the scheduled evidentiary hearing on confirmation of Mr. Bouchard's original Plan and Ms. Rotella's Motion. Mr. Bouchard's counsel stated at the outset of the hearing that it was his client's intention to modify the Plan, amend Schedule J to reduce the cable expense and remove the timeshare expense, and amend the means test form to include Ms. Doyle's $300 monthly contribution, which he failed to list on his original Schedule I. Nonetheless, his client wished to proceed with the hearing on the "good faith issue" raised by the Chapter 13 Trustee and Ms. Rotella.

Mr. Bouchard was present for the entirety of this 51-minute hearing, during which there was a lengthy colloquy about how the $300 monthly contribution should be reflected on the amended means test form and more generally about the proposed terms of a modified plan. Despite his knowledge prior to the start of this hearing that his circumstances would change, materially altering his finances, at no time during the hearing did Mr. Bouchard disclose to the Court, the other parties, or for that matter his own counsel, Ms. Doyle's purchase of the home and the couple's intention to move there the first of the year, or the ensuing changes in his finances that would result from such a move.

Ultimately, it was decided that the hearing would be continued to November 19, 2015, after Mr. Bouchard filed his amended plan and the other amended documents to give the parties ample time to review them. In hindsight, postponing the hearing was most prudent. The amended plan filed (i.e. the First Amended Plan) and supplemental Schedule J did not contain the revisions and plan provisions Mr. Bouchard (through his counsel) had previously represented they would contain. Instead, the amended documents were based upon the undisclosed financial changes that would occur for Mr. Bouchard once he moved into Ms. Doyle's home. Specifically, these new supplemental Schedules I and J reflected that as of January 1, 2016, he would be paying Ms. Doyle $950 a month for rent pursuant to a written lease and he would no longer receive her $300 monthly contribution.

To make matters worse, Mr. Bouchard's lack of candor to the Court and the other parties continued as he again failed to disclose other weighty life-changing events during the course of this bankruptcy case and the continued hearing on November 19, 2015. These were revealed only after being discovered by Ms. Rotella. The following exchange between Ms. Rotella's counsel

and Mr. Bouchard is just one example of Mr. Bouchard's failure to be forthcoming with

information clearly impacting his future finances and his proposed plan:

> Q: [Y]ou believe there will be no change in any of your expenses over the next five years?
> A: That's correct.
> Q: Okay. Now, Mr. Heitke [debtor's counsel] asked you some questions and referred to Jessica Doyle as your girlfriend, correct?
> A: Yes.
> Q: And she is your girlfriend?
> A: Yes.
> Q: Okay. Well, isn't it fair to say that she is your fiancée?
> A: (no audible response)
> > The Court: I – the record can't pick up a blink of the eye. You have to answer yes or no, please.
> Q: Is Jessica . . . your fiancée, Mr. Bouchard?
> A: Sure.
> Q: Yes?
> A: Sure. Well –
> Q: And, in fact, you gave her an engagement ring in September of 2015. Is that correct?
> A: Yes.
> Q: Okay. And planning to get married. Isn't that right?
> A: Not any time in the near future.
> Q: Oh, so there is no wedding date planned?
> A: Not set – . . .
> Q: And, in fact, when you just told me that you don't anticipate any change of expenses, isn't it true that Jessica is pregnant, carrying your child?
> A: She is.
> Q: Okay. So – and when is the baby due?
> A: April 2nd [of 2016].
> . . .
> Q: So there will be expenses for the care of your child.
> A: There will.

Tr. #129 at 44-45.

Ms. Rotella's counsel then questioned Mr. Bouchard further about the engagement ring

he gave to Ms. Doyle, establishing that he paid approximately $300 to $400 toward the cost of

the ring and borrowed the balance of the cost, between $1,400 and $1,700, from his father.

Neither the anticipated change to his expenses due to his engagement and Ms. Doyle's

pregnancy, nor the money Mr. Bouchard spent on the ring, nor the loan he received from his

father, nor his agreement to repay his father once he was "back on his feet," were accounted for

in any schedules or disclosures to the Court, the Trustee, or his creditors. Tr. #129 at 45-50.

Compounding his lack of candor, Mr. Bouchard's bankruptcy schedules were not

accurate, which he admitted. Tr. #129 at 50 ("Q: When you filed the bankruptcy schedules, were

they accurate or not, Mr. Bouchard? A: No, they weren't."). The evidence adduced at the

evidentiary hearings reveals other omissions, inaccuracies, and misrepresentations by Mr.

Bouchard about his finances, his explanations for which the Court finds evasive, unsatisfactory,

or not credible. He failed to disclose in his original schedules the joint bank account he held with

Ms. Doyle, claiming this omission to be "a simple mistake," and that he did not read all pages of

his schedules before filing them. Tr. #129 at 50-51. The Court does not find it credible that this

joint bank account was omitted merely as an oversight when, according to his testimony, the

account was regularly used to pay the monthly rent for their shared apartment.

Mr. Bouchard also did not list in his original schedules ownership of certain other assets,

and only amended those schedules to include such assets after he was questioned about their

existence by Ms. Rotella's counsel. These consist of a watch he later scheduled with a value of

$200, a security deposit placed with the landlord under the lease on which he and Ms. Doyle

were co-obligors, and his electrician's journeyman's license. The Court finds his proffered

excuses lacking in honesty, or at best, demonstrating a total disregard of his obligations as a

debtor to provide complete and accurate information about his assets. Again just by way of

example, he gave three different reasons for not listing the watch: (1) it was a gift, so he did not

10

think he had to disclose it; (2) he did not own the watch at the time he filed his bankruptcy

petition; and (3) the watch had slipped his mind. *See* Tr. #129 at 53-54.

      In addition to not disclosing Ms. Doyle's monthly contribution on the original schedules,

Mr. Bouchard did not list Ms. Doyle on Schedule G as a co-obligor on their apartment lease, a

critical piece of information in light of his paying and utilizing as an expense the full amount of

the $1,300 monthly rent. His explanation was, "Because I didn't read the fine print, sir." Tr. #129

at 56-59. This is simply not credible, especially considering the fact that he had no trouble

remembering to list his former girlfriend on Schedule G as a co-obligor on the timeshare

obligation he listed on this schedule.

      Inaccurate reporting of information continued in the supplemental schedules Mr.

Bouchard filed in the face of Ms. Rotella's challenges to the listed information. For instance, as

to both Mr. Bouchard's original Schedule J and his supplemental Schedules J, after review of the

documents and the testimony given at the hearings, it remains unclear whether some of the

expense figures represent his expenses alone or both his and Ms. Doyle's expenses. After

establishing that at the Creditors' Meeting Mr. Bouchard had testified under oath that the

expenses were for both him and Ms. Doyle, Ms. Rotella's counsel again questioned him on the

issue. This time he responded, "they're just mine." Tr. #129 at 102-04. ("Q: So the food expense

of $600 is just for you? A: Yes. Q: Even though you told me on May 1st [at the Creditors'

Meeting] the food was for you and Jessica? A: Sure.").

      Additionally, although he no longer sought to include the monthly timeshare fee as an

expense and stated in his supplemental Schedule J filed in October 2015 that he would no longer

be making this monthly payment, he appeared to recant this representation at the November 2015

hearing. He had in fact made the November 2015 timeshare payment, and when questioned if he

intended to make the next month's payment and thereafter, he answered: "I don't know what's –
I suppose. I mean, I don't really know what's going to happen with the plan, so . . . ." Tr. #129 at
93. Upon further questioning by the Trustee, he responded that the monies to pay the fee came
from his earnings as an electrician. As the Trustee inferred at the hearings, for Mr. Bouchard to
be able to make this payment even though he listed zero payment on this obligation creates
considerable doubt about the accuracy of his other listed expenses. *See* Tr. #129 at 120-21 ("Q:
But would it be correct that in order to pay for the timeshare, that means some of the other
expenses listed on your schedules must be incorrect?").

　　　　To be clear, this case is not simply about the failure to list a watch of limited value, a
journeyman's license that is not transferrable or saleable, or inaccurately reporting some living
expenses. If it were, then there would be no serious issue about bad faith and there likely would
not have been any evidentiary hearings. While Mr. Bouchard may be, as he maintains,
unsophisticated when it comes to finances, he cannot use this excuse to escape the trap he has set
for himself through his untruthfulness, lack of candor, and intentional non-disclosures of
important information affecting his financial circumstances and his multiple proposed plans. The
Court finds that, at best, Mr. Bouchard has demonstrated reckless disregard of his obligation to
provide accurate, truthful information on his schedules and his means test. Even more
compelling are the omissions of the monthly funds received from Ms. Doyle, the non-disclosures
about their financial arrangements, and the reluctant untimely disclosures of material changes in
their circumstances substantially impacting the confirmability of such plans. The evidence
compels the Court to conclude that these non-disclosures and misleading information were
intentional to avoid scrutiny by the Trustee and creditors of Mr. Bouchard's financial
arrangements with Ms. Doyle. And, the Court finds, Mr. Bouchard deliberately manipulated his

income and expenses throughout the proceedings in an effort to obtain confirmation of his

various proposed plans and overcome the objections to them.

**IV.     Applicable Law**

Section 1307(c) provides that "on request of a party in interest . . . the court may convert a

case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this

chapter, whichever is in the best interests of creditors and the estate, for cause . . . ." While the

Code does not define "cause," the section enumerates 11 non-exhaustive grounds for finding

cause, including lack of good faith—or bad faith—for conversion or dismissal under § 1307(c).

*Zizza v. Pappalardo (In re Zizza)*, 500 B.R. 288, 293 (B.A.P. 1st Cir. 2013) (citing *Cabral v.

Shamban (In re Cabral)*, 285 B.R. 536, 572 (B.A.P. 1st Cir. 2002)). Ms. Rotella, as the moving

party, bears the burden of proof to establish that cause exists to convert or dismiss Mr. Bouchard's

case. *Id*.

"There are two separate and distinct tranches of good faith in Chapter 13 cases. The debtor

must *both* have filed the Chapter 13 case in good faith and [have] proposed the Chapter 13 plan in

good faith." *Torres Martines v. Arce (In re Torres Martinez)*, 397 B.R. 158, 165 (B.A.P. 1st Cir.

2008); *see also* § 1325(a)(7) (good faith requirement in filing petition), § 1325(a)(3) (good faith

requirement in proposing plan). Ms. Rotella argues that Mr. Bouchard lacked good faith in the

filing of his bankruptcy petition as well as in the filing of his various chapter 13 plans. The Court

need only find the first, although the continued manipulation of his income and expenses even

through the filing of the Second Amended Plan and accompanying supplemental schedules is

grounds for finding bad faith in Mr. Bouchard's multiple plan filings.

Bankruptcy courts use a totality of the circumstances test to determine whether a debtor

filed a bankruptcy petition in good faith. *In re Zizza*, 500 B.R. at 293 (citing *Sullivan v. Solimini*

*(In re Sullivan)*, 326 B.R. 204, 211 (B.A.P. 1st Cir. 2005)). Notably, both the debtor's pre- and

post-petition conduct is relevant in making this determination. *Id.* Courts include the following

factors in their consideration: (1) the debtor's accuracy in stating his assets, income, debts, and

expenses; (2) the debtor's honesty in the bankruptcy process, including whether he has attempted

to mislead the court and whether he has made any misrepresentations; (3) whether the debtor has

attempted to unfairly manipulate the Bankruptcy Code; (4) the type of debt the debtor seeks to

discharge; (5) whether the debtor's debt would be dischargeable in a chapter 7 bankruptcy; and

(6) the debtor's motivation and sincerity in seeking chapter 13 bankruptcy relief. *Id.*; *In re

Sullivan*, 326 B.R. at 212.

     "Bad faith generally requires something 'more than a mistake or inadvertence'; it requires

'some form of deception.'" *In re Taal*, 520 B.R. 370, 376 (Bankr. D.N.H. 2014) (quoting *In re

Valentine*, 2009 WL 3336081, at *2 (Bankr. D.N.H. Oct. 14, 2009)). "A debtor's mere

carelessness or oversight would probably be insufficient on its own to show bad faith"; however,

a debtor's reckless disregard for the accuracy of his or her schedules can constitute bad faith. *Id.*

(citations omitted); *see also Marrama v. Citizens Bank (In re Marrama)*, 430 F.3d 474, 478 (1st

Cir. 2005) (finding that debtors seeking bankruptcy protection cannot "play fast and loose with

their assets or with the reality of their affairs"). The Court need not find fraudulent intent by a

debtor to find bad faith. *See In re Cabral*, 285 B.R. at 573 (citing *Ho v. Dowell (In re Ho)*, 274

B.R. 867, 876 (B.A.P. 9th Cir. 2002)).

     The court's power to dismiss or convert a chapter 13 case is discretionary. *Collier on

Bankruptcy* ¶ 1307.04[4] (Alan N. Resnick & Henry J. Sommers eds., 15th ed. rev.) (citations

omitted); *see In re Blaise*, 219 B.R. 946, 949-50 (B.A.P. 2d Cir. 1998). The determination is a

fact intensive one. "Whether this balancing of equities is called moralistic, judging, or evaluating,

it is exactly what the courts have been left with under the ambiguous requirement of good faith."

*In re Dicey*, 312 B.R. 456, 459 (Bankr. D.N.H. 2004). As has long been the case, the fresh start

policy of the Bankruptcy Code "limits the opportunity for a completely unencumbered new

beginning to the 'honest but unfortunate debtor.'" *Grogan v. Garner*, 498 U.S. 279, 286-87

(1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

## V.    Analysis and Conclusions of Law

### A.    Cause Under § 1307(c)

Based upon the Court's findings of fact detailed above, applying the relevant criteria and

considering the totality of the circumstances, the Court concludes that Mr. Bouchard lacked good

faith when he filed his bankruptcy petition. In summary, he inaccurately disclosed his assets,

income, debts, and expenses; he was untruthful during the plan confirmation process; and he

either intentionally or recklessly misled the Court and the other parties through material omissions

and misrepresentations of information. "When a debtor files her Schedules, she does so under the

equivalent of an oath." *Premier Capital, LLC v. Crawford (In re Crawford)*, No. 16-1285, 2016

WL 6569228, at *4 (1st Cir. Oct. 25, 2016) (citing Fed. R. Bankr. P. 1008, and *Perry v. Warner*

*(In re Warner)*, 247 B.R. 24, 26 (B.A.P. 1st Cir. 2000)). "Debtors have an absolute duty to report

whatever interests they hold in property, even if they believe their assets are worthless or are

unavailable to the bankruptcy estate." *Wood v. Premier Capital, Inc. (In re Wood)*, 291 B.R. 219,

226 (B.A.P. 1st Cir. 2003).

Mr. Bouchard's subsequent amendments and supplements to his schedules to include

some of the omitted information after he was challenged by Ms. Rotella "cannot expunge the

falsity" of his original oath, and the timing of his disclosures in response to questioning at the

Creditors' Meeting and at the hearings show that, to put it bluntly, he disclosed material

information only because "the cat was out of the bag." *In re Zizza*, 500 B.R. at 294 (quoting

*Satriale v. Mumin (In re Mumin)*, No. 97-0993DAS, 1998 WL 160992, at *2 (Bankr. E.D. Pa.

Apr. 1, 1998), and *Wieland v. Miller (In re Miller)*, 448 B.R. 551, 569 (Bankr. N.D. Okla. 2011)).

But Mr. Bouchard's omission of material information is only one aspect of his conduct

that establishes a bad faith filing. The evidence demonstrates Mr. Bouchard repeatedly abused the

bankruptcy process by manipulating his income and expenses with the goal of overcoming the

objections to confirmation of his various proffered plans in order to receive a discharge from his

debts. He filed multiple revisions of his Schedules I and J conveniently containing amendments to

his income and expenses designed to create an inaccurate projected disposable income figure[7] to

fit each such proposed plan.

This manipulation continued with the Second Amended Plan, the last amended plan he

filed for the Court's consideration. Ms. Rotella astutely points out that Mr. Bouchard reported

greater net income from his wages than he actually receives. He testified that his net weekly

earnings is $780, a monthly total of $3,380, but on his last filed supplemental Schedule J he

reported net monthly income of approximately $3,522, a difference of $142 per month. *See* Tr.

#128 at 63; Schedule J (Doc. #99).[8] According to his testimony and his own admission at the

April 2016 reopened evidentiary hearing, that schedule also underreported his vehicle fuel and

---

[7] Bankruptcy Code § 1325(b)(1)(B) requires that if an objection to plan confirmation is raised by the chapter 13
trustee or an unsecured creditor and the plan does not provide for full payment of the objecting creditor's claim, the
plan cannot be approved unless it provides that "all of the debtor's projected disposable income to be received in the
applicable commitment period beginning on the date that the first payment is due under the plan will be applied to
make payments to unsecured creditors under the plan." While the term "projected disposable income" is not defined
by the Code, the United States Supreme Court has stated that when a bankruptcy court calculates a debtor's
projected disposable income it should multiply the monthly income by the number of months in the plan and
determine what portion is "excess" or "disposable." However, the court also "may account for changes in the
debtor's income or expenses that are known or virtually certain at the time of confirmation." *Hamilton v. Lanning
(In re Lanning)*, 560 U.S. 505, 524 (2010).

[8] The Court may take judicial notice of the bankruptcy docket. *See LeBlanc v. Salem (In re Mailman Steam Carpet
Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) ("The bankruptcy court appropriately took judicial notice of its own
docket . . . .").

maintenance expenses by nearly $300 per month. *See* Tr. #128 at 75-77; Schedule J (Doc. #99).

And, despite his testimony that he would be paying one-half of the child care costs for his

newborn child, which he estimated to be about $241 per month, no such expense was included on

that supplemental Schedule J. *See* Tr. #128 at 80-81; Schedule J (Doc. #99). Ms. Rotella is correct

that if Mr. Bouchard had reported truthful and accurate income and expense figures on his

supplemental Schedule J filed in support of the Second Amended Plan, they would reveal that Mr.

Bouchard's monthly disposable income was insufficient to fund the plan, thus rendering it not

feasible and unconfirmable.

Some of the other factors to be considered are relevant to the Court's determination of the

Motion, such as the nature of the debts sought to be discharged and the timing of the filing. Ms.

Rotella's contingent debt, stemming from the approximately $70,000 deficiency claim owed to

PCU on which she shares liability with Mr. Bouchard, would not be dischargeable in a chapter 7

bankruptcy. Contrary to her contentions, given Mr. Bouchard's substantial debt to PCU and the

collection action it brought against him, as well as his other debts, the Court finds that the sole

motivating factor in filing his petition was not to discharge this contingent debt arising out of their

divorce. But the evidence does suggest that a major motivating factor in Mr. Bouchard's filing

and post-petition conduct was to diminish the impact of his bankruptcy filing on Ms. Doyle

relative to their shared household expenses. Nor should the Court overlook the timing of the

filing, the day prior to a scheduled family court contempt hearing against Mr. Bouchard for not

complying with his obligations under the divorce judgment.

In considering these factors, the evidence adduced at the hearings, and the totality of the

circumstances, the Court concludes that Mr. Bouchard's filing was in bad faith. His chapter 13

bankruptcy was not motivated by a sincere desire to obtain relief from his debts while paying all

of his projected disposable income to his creditors over the applicable plan term. Rather, his overriding motivation, one that led to untruthful and inaccurate reporting of his financial affairs, was based on: (1) avoiding the obligation to his former spouse that he voluntarily undertook at the time of their divorce, and (2) laying the groundwork for his and Ms. Doyle's future success by assisting her financially in the purchase of her home and paying a substantial portion of their joint household living expenses despite his insolvency.

This became clear during the hearings. Mr. Bouchard accompanied Ms. Doyle on her house hunting trips and helped her save money towards the purchase by shouldering the full rent burden under the apartment lease on which she was equally responsible. Tr. #129 at 76-77, 142. Asked at the first evidentiary hearing, "But if you now think paying half the rent is fair [a change he proposed in his supplemental Schedules I and J filed with the First Amended Plan], it seems to me you would have thought paying half the rent was fair a year prior." His response: "Well, I'm not really sure what the purpose of the question is, I guess." Tr. #129 at 124. What the question explores is a basic fairness, not only with regard to the allocation of responsibility for paying rent, but more importantly with regard to the fairness of a debtor and his non-debtor fiancée gaming the bankruptcy system to their advantage and, consequently, to the detriment of creditors. It is telling that upon moving into her house with her, he agreed to pay rent equal to one-half her monthly mortgage payment.

Mr. Bouchard's responses to cross-examination questioning on this point are worth highlighting here because they underscore the intentional abuse of the bankruptcy system through the manipulation of his income and expenses solely to serve his and Ms. Doyle's purposes, without considering his creditors. Tr. #129 at 125 (Q: "[D]id you understand that if she was paying more [for household expenses such as rent], that that money would be paid to your

creditors, in fact? Did that enter your mind? A: No."). Asked if he had discussed with Ms. Doyle

reducing his future contributions to her monthly mortgage payments in light of his financial

plight and the need to fund a confirmable chapter 13 plan, Mr. Bouchard stated he had not.

> Q: Could you do that?
> A: I'm sorry? Could I afford to do that? Is that –
> Q: No, no, no. You filed statements saying you're going to
> start paying $950 a month in January.
> A: Right.
> Q: Half of her – your fiancée's mortgage payment. Yet for
> the prior seven months, you've been picking up the full 100
> percent of the lease payment for Jessica. I'm wondering if you've
> had any inclination to talk with Jessica about perhaps reducing the
> amount of your contribution.
> A: Well, no.
> Q: Why not?
> A: Because we have a child on the way.

Tr. #129 at 104-05.

The bad faith shown by Mr. Bouchard in his filings throughout this case cannot be

condoned. Nor can debtors intentionally fail to disclose required material information on their

schedules or act in reckless disregard of the truth, and then expect that all is cured by filing

amendments to those schedules after they have been caught. The Code allows generous relief to

the "honest but unfortunate" debtor, but "[i]n bankruptcy administration, the system will collapse

if debtors are not forthcoming." *Hannon v. ABCD Holdings, LLC (In re Hannon)*, 839 B.R. 63,

71 (1st Cir. 2016) (quoting *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 112 (1st Cir. 1987)).

Mr. Bouchard simply has not acted before this Court in good faith with full appreciation

of his duty as a debtor to make complete, honest, and accurate disclosures of his financial

circumstances. Ms. Rotella has indeed established cause under § 1307(c).

Case 1:15-bk-10543   Doc 139   Filed 12/05/16   Entered 12/05/16 13:58:51   Desc Main
                        Document      Page 20 of 21

B.        Appropriate Remedy: Dismissal or Conversion

The Court must now, in the exercise of its discretion, decide whether the case should be dismissed or, as Ms. Rotella presses for obvious reasons, converted to a case under chapter 7. Section 1307(c) directs that once cause has been found, "the Court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case, *whichever is in the best interests of creditors and the estate . . . .*" (emphasis added). After carefully considering her arguments with an open mind, the Court is not persuaded that the appropriate remedy here is to convert the case. The Court cannot see how conversion would aid anyone other than Ms. Rotella, and it certainly would not be in the best interests of Mr. Bouchard's other unsecured creditors who collectively hold non-contingent claims totaling nearly $77,000. The claims of these other 12 creditors consist of the $70,000 deficiency claim of PCU, which gives rise to Ms. Rotella's contingent claim against Mr. Bouchard in the same amount, and other unsecured claims relating predominantly to medical services. *See* Schedule F (Doc. #1).

It is highly relevant to the Court's determination to consider the current nature of Ms. Rotella's claim. While she, together with Mr. Bouchard, has been sued by PCU, at this time her claim in this case is contingent and unliquidated. No judgment has entered against her in the state court action. *See* Tr. # 128 at 48. She has not presented any evidence that she has paid any portion of the joint obligation owed to PCU, that the state court action is actively proceeding against her, or that she has paid or anticipates expending significant legal fees to defend the action. If Mr. Bouchard's bankruptcy case is dismissed rather than converted, he will remain jointly liable on the PCU debt with Ms. Rotella and there would be no stay in effect to prevent PCU from collecting all or a portion of the debt from him. Thus, the amount Ms. Rotella may ultimately have to pay on the debt, if any, is undetermined at this time.

20

The only creditor who would immediately benefit from converting the case is Ms. Rotella, because of the differences in the relevant discharge provisions between chapter 13 and chapter 7 that would render her claim nondischargeable upon conversion.[9] All creditors, not just Ms. Rotella, would be equally served by dismissal of this case, whereupon they would be on equal footing to pursue collection of their claims against Mr. Bouchard. And to the extent that PCU collects any monies on its claim from Mr. Bouchard, this would reduce Ms. Rotella's exposure on the debt (of course, the reverse is also true).

## VI.    Conclusion

Mr. Bouchard's case was filed in bad faith and cause has been shown under § 1307(c) for its dismissal or conversion. Ms. Rotella's Motion is GRANTED IN PART, and the case is DISMISSED. Such dismissal renders Mr. Bouchard's Second Amended Chapter 13 Plan MOOT.

Date: December 5, 2016                                    By the Court,

_Diane Finkle_

_____
Diane Finkle
U.S. Bankruptcy Judge

---

[9] That is not to say that, as a result of his bad faith, Mr. Bouchard might not potentially be denied a discharge entirely under Bankruptcy Code § 727 if his case were converted to chapter 7. *See In re Crawford*, 2016 WL 6569228, at *4 (citing to § 727(a)(4)(A), that a court shall grant a debtor a discharge under chapter 7 unless "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account . . . ."). But such a potentiality would require litigation and is by no means immediate or certain.